**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LONELLE C. PENNINGTON,                    Case No. 1:17-cv-264

      Plaintiff,                              Black, J.
                                          Bowman, M.J.
  v.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Lonelle C. Pennington filed this Social Security appeal in order to challenge the Defendant's determination that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error. As explained below, the ALJ's finding of non-disability should be REVERSED because it is not supported by substantial evidence in the administrative record.

### I. Summary of Administrative Record

The instant appeal is Plaintiff's second time before this Court. In a prior appeal, this Court remanded an adverse disability decision to the ALJ for further consideration. The same ALJ reached the same decision after remand, prompting this second judicial appeal.

The administrative record reflects that the Commissioner first awarded Supplemental Security Income ("SSI") benefits to Plaintiff when she was less than six months old, based on a combination of cystic fibrosis and borderline intellectual functioning. However, those benefits were discontinued in June 2007, after a continuing

1

disability review when Plaintiff was 20 years old.[1] The record does not reflect whether Plaintiff appealed the cessation determination, but does reflect that she filed a new application for benefits on July 2, 2009, which was denied and not appealed. (Tr. 50, 62, 147).

On July 8, 2010, Plaintiff filed a second adult application, alleging disability based upon mental retardation, bipolar disorder, and depression. (Tr. 60, 72). That application also was denied initially and on reconsideration. Plaintiff requested a hearing *de novo* before an Administrative Law Judge ("ALJ"), and appeared before ALJ Kristen King on February 24, 2012. (Tr. 24-43). On March 30, 2012, ALJ King filed a written decision determining that Plaintiff was not disabled. (Tr. 8-19). After the Appeals Council denied further review, Plaintiff filed a judicial appeal in this Court. In a Report and Recommendation subsequently adopted as the opinion of the Court, the undersigned determined that remand was required because the ALJ "failed to provide sufficient reasons for her determination that [Plaintiff] did not meet or equal Listing [12.05C], for mild mental retardation." (Tr. 528).

During the pendency of proceedings before this Court, in August 2013, Plaintiff filed additional applications for benefits.[2] (Tr. 341). Plaintiff's multiple proceedings were consolidated on remand from this Court at the administrative level, and the case returned to ALJ King. The ALJ held a new evidentiary hearing on August 11, 2015, at which Plaintiff appeared and gave testimony, as did Plaintiff's mother and a vocational expert.

---

[1]Plaintiff reported to a consulting psychologist that "I had SSI before they took it away because my aunt didn't take me to my doctor appointments." (Tr. 272).
[2]At least one new application was for child's benefits for the period prior to December 20, 2008, when Plaintiff turned age 22. (Tr. 369).

(Tr. 378-430).  On October 15, 2015, the ALJ again found that Plaintiff did not meet or equal Listing 12.05C, and further determined that Plaintiff was not under a disability based upon testimony from a vocational expert that a hypothetical individual with Plaintiff's residual functional limitations, as determined by the ALJ, would still be able to perform a substantial number of jobs in the national economy.  (Tr. 341-369). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's October 2015 decision as the Defendant's final determination.

Plaintiff was 29 years old at the time of ALJ King's last decision.  She completed high school, although records reflect that she was enrolled in special education classes throughout her secondary education. (Tr. 367).  She has no past relevant work, having held only one job since graduating from high school for a period of approximately four weeks, which she was unable to continue despite the assistance of a job coach.  She has not engaged in any substantial gainful activity since her alleged disability date.

The ALJ found that Plaintiff has the severe impairments of: "asthma, a history of bronchial pulmonary dysplasia, borderline intellectual functioning, and mood, anxiety, and personality-based disorders." (Tr. 344).   These impairments did not alone, or in combination with any other impairments, meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 346).  Rather, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform less than a full range of medium work, limited physically by her inability to climb ladders, ropes, and scaffolds and need to avoid concentrated exposure to environmental irritants such as fumes, odors, dusts, and gases.  (Tr. 353).  The ALJ found that Plaintiff's significant mental impairments further limit her as follows:

[T]he claimant is limited to simple, routine tasks. She remains capable of performing goal-oriented work, but is unable to engage in constant production-rate pace work such as that associated with an automated assembly line. She is limited to a static work environment, defined as one in which changes in the work setting occur no more than approximately 10% of the workday. The claimant remains capable of no more than occasional interaction with supervisors and co-workers, and can interact with the public no more than approximately 15% of the workday. However, she can never take part in tandem tasks or transactional interactions such as sales or negotiations.

(Tr. 353). Based on the testimony of the vocational expert, the ALJ concluded that Plaintiff could still perform "jobs that exist in significant numbers in the national economy," including the jobs of stacker, hand packer, labor freight stock, and equipment cleaner at the medium exertional level, and additional similar unskilled work at the light and sedentary levels should her exertional abilities be further reduced. (Tr. 367-368). Accordingly, the ALJ determined that Plaintiff is not under disability, as defined in the Social Security Regulations, and is not entitled to benefits. (Tr. 368-369).

On appeal to this Court, Plaintiff argues that the ALJ erred: (1) by failing to find that she met or equaled Listing 12.05C; (2) by failing to adequately define Plaintiff's mental RFC; and (3) by failing to find Plaintiff fully credible. The undersigned agrees that the record evidence overwhelmingly establishes that Plaintiff meets or equals Listing 12.05C in this case, and therefore concludes that this case should be remanded for an immediate award of benefits.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for SSI benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both

"medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination,

meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §416.920. However, a plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability or supplemental security benefits. *See* 20 C.F.R. § 404.1512(a).

## B. Plaintiff's Assertions of Error

### 1. Listing 12.05C

Plaintiff asserts that the ALJ's determination that she did not meet or equal Listing 12.05C is not supported by substantial evidence. Despite the ALJ's attempt to provide greater analysis than she included in the previously remanded 2012 decision, I agree that the 2015 decision still lacks substantial support in the record.

The Listing for Intellectual Disability, previously termed "Mental Retardation,"[3] is contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, stated at the time of the ALJ's decision:[4]

> 12.05 <u>Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive</u>

---

[3]In 2013 the Commissioner replaced the term "mental retardation" with "intellectual disability" in the regulation at issue here. *Change in Terminology: "Mental Retardation" to "Intellectual Disability"*, 78 Fed.Reg. 46,499 (Aug. 1, 2013) (codified at 20 C.F.R. pt. 404, subpt P, app. 1). The change in terminology did not reflect any substantive change. *Id.* at 46,500–01. Due to the use of the prior term in case law and some of the documents of record, this R&R uses a combination of both terms.

[4]Additional changes to Listing 12.05 have been made since 2015, including revisions and guidance that attempts to further define "adaptive functioning." However, those changes are not retroactive to this proceeding.

functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports an onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

….

B. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function,

*Id.* (emphasis added).

Most of the provisions of Listing 12.05 require qualifying IQ scores. In *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), the Sixth Circuit clarified that in addition to a qualifying IQ score, a claimant is required to satisfy the "adaptive functioning" standard contained in the preamble to Listing 12.05 in order to meet or equal the Listing. In *Foster*, the plaintiff had dropped out of school after the ninth grade and had qualifying IQ scores measured when she was 42 years old, but was held still not to satisfy Listing 12.05C because there was no evidence of deficits in adaptive functioning before age 22, and because her long-standing work record as an accounting clerk at a bank and as a liquor store clerk demonstrated an "ability to perform relatively complicated tasks." *Id.* at 355. Both in *Foster* and in subsequent cases, the Sixth Circuit has held that in order to meet Listing 12.05, a plaintiff must show: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations," in addition to the criteria under A, B, C, or D of Section 12.05. *Hayes v. Com'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir. 2009). "Adaptive functioning" involves an individual's "effectiveness in areas such as social skills, communication, and daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her

age by his or her cultural group." *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)(additional citation omitted).

As stated, the undersigned reversed and remanded the ALJ's 2012 decision based upon her failure to include adequate discussion of the relevant criteria, including IQ scores and adaptive functioning. In her 2015 decision, the ALJ attempted to remedy those errors with additional discussion, beginning with IQ scores. Only one qualifying IQ score is required to meet Listing 12.05; here, the ALJ acknowledged that Plaintiff has multiple qualifying IQ scores. (Tr. 350, acknowledging Plaintiff's IQ scores "presumptively place her within the range of scores triggering a reviewing of listing 12.05C"). For example, on November 30, 2007, when Plaintiff was 20 years old, she achieved a performance scale IQ of 63 and a full scale IQ of 65, with overall performance "classified in the extremely low range," (Tr. 218). In October 2010, when Plaintiff was 23, a WAIS-IV IQ test reflected even lower scores, with a composite score of just 43, and verbal comprehension and processing speed scores of 50-51. (Tr. 277, 280). On October 19, 2012, when Plaintiff was 25 years old, IQ testing reflected a verbal comprehension score of 68, working memory of 66, and a full scale IQ of 63, with a general ability score that placed her functioning "in the Extremely Low range of cognitive abilities," exceeding only 1% of individuals her age. (Tr. 880). Plaintiff's scores suggest "great difficulty in keeping up with her peers in a wide variety of situations that require thinking and reasoning abilities," and reflect that "[h]er ability to reason with words is comparable to her ability to reason without the use of words." (*Id.*) Based upon her IQ scores, Plaintiff has been formally diagnosed by several examiners with mild mental retardation. (Tr. 881).

With respect to Listing 12.05C, then, it is undisputed that Plaintiff has consistently valid, qualifying IQ scores, verified on multiple occasions, including test scores obtained prior to the age of 22 (the developmental period).[5] Both parties agree, and the ALJ further found, that Plaintiff also has both physical and mental limitations that cause additional functional limitations. (Tr. 344, finding Plaintiff to have "asthma, a history of bronchial pulmonary dysplasia…and mood, anxiety, and personality-based disorders").[6] With Plaintiff having satisfied two out of the three criteria for Listing 12.05C (a qualifying IQ score and additional impairment), the ALJ's determination that she did not meet the Listing rests on her finding that Plaintiff does not satisfy the "adaptive functioning" element contained in the preamble to Listing 12.05C.

The specified language requires a claimant to have "deficits in adaptive functioning initially manifested during the developmental period." The grammatical construction of the referenced phrase is ambiguous, but the use of the word "initially" implies that a plaintiff may be required to show both (a) deficits in adaptive functioning that began prior to age 22; and (b) deficits in adaptive functioning that continued into adulthood, beyond age 22. Sixth Circuit case law generally supports that interpretation. *Accord Foster*, 279 F.3d at 355 (noting the absence of evidence of deficits before age 22, referring to work in adulthood as accounting clerk to buttress conclusion). In this case, the ALJ's analysis

---

[5]One of Plaintiff's IQ scores falls within the criteria of Listing 12.05B, but Plaintiff does not argue that she satisfies that portion of the Listing.

[6]Plaintiff has been hospitalized for mental illness, including hearing voices and cutting herself, on at least three occasions in February 2008, March 2009, and December 2012. However, Plaintiff does not argue that her mental illness meets or equals any Listing, and the referenced episodes were all of short duration. (Tr. 349). The ALJ was critical of her "inconsistent reports of hallucinations and violence," (Tr. 361). Suffice it to say, the undersigned finds fewer inconsistencies than did the ALJ. However, considering that Plaintiff is entitled to benefits under Listing 12.05C and does not present other specific challenges to the findings on the severity of her mental illness, the undersigned finds no need to elaborate.

indicates that she found no deficits in adaptive functioning at all, either prior to age 22 or after that age. Rather than finding adaptive functioning consistent with intellectual disability, the ALJ determined that Plaintiff "displays historical levels of adaptive functioning recognized by treating and examining sources alike that lead to the proper classification of her intellect at borderline levels." (Tr. 350). The "borderline" level is just above Listing level severity. Therefore, the ALJ found Plaintiff does not meet Listing 12.05C for intellectual disability.

Unfortunately, the ALJ's analysis appears to be extremely result-driven and reflects significant reversible error. First, the ALJ erred in her consideration of Plaintiff's school records, which the ALJ claimed "confirm the presence of adaptive functioning that exceeds the intellectual disability standard," (Tr. 352), despite the fact school records confirm <u>the exact opposite</u>. The ALJ conceded that Plaintiff "received accommodations that included resource room instruction and a lenient grading policy that somewhat inflated the marks she received," but incorrectly believed that the facts that she "was never retained and drew universal praise…as a diligent worker…." were sufficient to take Plaintiff out of Listing level impairment. (*Id.*) The ALJ also (erroneously) found "increased mainstreaming within the general curriculum over time," and - notwithstanding the admittedly lenient grading - cited her "achievement of a high school diploma with a cumulative grade point average of 2.339." (*Id.*) The ALJ cited Plaintiff's ability to read at a fifth grade level and a report of "mild" delays in math fluency as well as "self-reports" of adequate reading abilities. (*Id.*)

Upon close review, it is apparent that the evidence of Plaintiff's supposed academic prowess was either over-stated or misstated by the ALJ. Perhaps most

troubling is the ALJ's failure to acknowledge the objective test results that confirm deficits in adaptive functioning.

For a variety of reasons, many claimants who pursue social security benefits do not have school records that reflect IQ scores or objectively measured test scores in adaptive functioning prior to the age of 22. Here, however, Plaintiff has both. Plaintiff's records reflect that she has qualified for special education services "since preschool," consistent with her prior receipt of SSI since the age of six months.[7] (Tr. 192). Although it is true that Plaintiff was never retained, her records reflect that she remained in special education classes throughout her academic career based upon her "cognitive disability." (Tr. 355). Records reflect that Plaintiff remained in special "resource room classes for English, Math and Social Studies" at one high school, but was in an "inclusionary Science class" and "specials," meaning gym. (*Id.*; *see also* Tr. 187). Her science teacher reported that she "is primarily able to pass this Science course due to the amount of effort she puts forth"; other records explain that she "sometimes…takes science tests with Ms. Marsha or Mrs. Zehender." (Tr. 193). Thus, Plaintiff's participation in a "mainstreamed" science course was part of an "inclusionary" policy, with considerable accommodations. In connection with a transfer to a new high school,[8] an IEP refers to an intent to "mainstream" Plaintiff in English and placement in a "regular history class" for her senior year (Tr. 199). The record remains unclear as to whether that actually occurred, but regardless, there is

---

[7]Records indicate that Plaintiff was born three months prematurely with impairments from birth. (Tr. 691). She remains petite in adulthood, at 4 foot 9 and approximately 100 pounds. (Tr. 217).

[8]Consistent with her frequent moves between family members, records at the age of 17 from North College Hill reflect that Plaintiff had transferred into that district from the Mariemont school district. (*See* Tr. 212). She subsequently transferred to the Lynchburg-Clay High school from North College Hill prior to her senior year, as reflected by the IEP assessment on which the ALJ relied.

no indication of whether the intended placement was based on the new school's resources or Plaintiff's (wholly undocumented) academic gains. There is no support for an "increase" in Plaintiff's intellectual *ability* to engage in "mainstreamed" coursework.

More critically, the ALJ failed to discuss a school psychologist's formal assessment of Plaintiff's adaptive functioning at age 17, including the administration of an adaptive function test called the SSSQ ("Street Survival Skills Questionnaire"). The psychologist reported that Plaintiff's score fell in a "well below average" range of adaptive functioning across multiple measures, with "'<u>severe</u> problems in knowledge of [health and safety]:' particularly with dental and hair care, taking care of burns and cuts, wearing the safest clothing at nighttime, etc." (Tr. 194, emphasis added). The psychologist noted that Plaintiff needs assistance to prepare for her "female times of [the] month," and that she remained well below grade level across other measurements of adaptive behaviors such as academic achievement, with her ability to write at a fourth grade level, and reading at an oral fifth grade level. (*Id.*) Math calculation skills were comparable to an "average individual at age 10-5," although overall "broad math" skills were somewhat lower, comparable to the "average individual at age 9-3." (Tr. 195). As to the ALJ's asserted reliance on Plaintiff's high school diploma, Plaintiff was unable to pass <u>any</u> of her ninth grade proficiency tests despite accommodations provided in every subject area. (Tr. 187). Thus, the evidence unequivocally and overwhelmingly supports that Plaintiff had both qualifying IQ scores and objectively measured significant deficits in adaptive functioning during her school years, well before the age of 22. *Accord Dragon v. Com'r*, 470 Fed. Appx. 454, 463 (6th Cir. 2012) (reversing and awarding benefits under Listing 12.05C where plaintiff graduated high school only with IEP and did not pass high school

proficiency tests).  The ALJ committed reversible error in finding that Plaintiff's school records demonstrated a "historical" lack of such deficits.

To the extent that Listing 12.05 also requires a showing of deficits in adaptive functioning <u>after</u> the age of 22, the ALJ's analysis reflects additional error.  For example, the ALJ cited Plaintiff's "ability to sufficiently comprehend and complete disability-related forms submitted in connection with her applications."  (Tr. 352, citing Exhibit 7E).  The ALJ emphasized: "Notably, the claimant completed her own accompanying symptoms report at this time, conveying basic necessary information clearly, concisely, and legibly (see Exhibit 7E/4)."  (Tr. 346).  However, Exhibit 7E plainly states that it was completed by the Plaintiff's <u>mother</u>.[9]  (Tr. 174).  Other disability-related application forms also were completed by Plaintiff's mother. (Tr. 174-177, 166-173, 692-699).  A disability phone interview was completed only with Plaintiff's mother's assistance.  (Tr. 681, agency examiner's note that claimant "was polite and *tried* to answer questions.  Her mother assisted on the phone with answering questions" (emphasis added)).

## 2. The Impact of the Credibility Assessment on the Listing Analysis

The ALJ's highly adverse credibility determination appears to have heavily influenced her findings concerning Plaintiff's adaptive functioning, leading her to ignore and/or misstate multiple records.  The ALJ repeatedly attributes minor discrepancies to intentional deceit rather than to errors in the precise recall of an intellectually challenged claimant. (Tr. 360, stating that "inconsistencies suggest that the claimant possesses

---

[9]Defendant maintains, presumably based on the use of the personal pronoun "I" on the symptoms report, that Plaintiff completed that portion of the form.  It is unclear to the undersigned whether that is the case, or whether her mother transcribed dictated responses. Regardless, a review of what the ALJ believed were admirably "concise" responses is consistent with the fourth to fifth grade literacy skills that Plaintiff possesses, and not inconsistent with intellectual disability.

sufficient mental acumen to conceive, design, and execute a plan designed for the purpose of self-benefit"). The undersigned is well aware of the fact that this Court will seldom re-evaluate credibility determinations, which are entitled to great deference. *See generally Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In this case, however, the ALJ's focus on minor perceived discrepancies was striking because the ALJ frequently misstated the record entirely,[10] giving this Court a "compelling reason" to question the accuracy of the assessment. *See Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Notably, despite some inconsistencies and responses in which Plaintiff had poor recollection or did not know the answer, none of the examining psychologists or other medical providers believed her to give less than full effort. No examiner invalidated the objective IQ scores; rather, they noted that she "did not purposely under exaggerate or over exaggerate her report of symptoms." (*See, e.g.,*Tr. 227). *Accord Quattlebaum v. Com'r of Soc. Sec.*, 850 F. Supp.2d 763 (S.D. Ohio Sept. 13, 2011) (reversing and remanding under Listing 12.05C where ALJ improperly discounted medical opinion and other evidence on the basis of poorly supported adverse credibility finding).

In addition to the denial of the existence of records that overwhelmingly support Plaintiff's claim of adaptive functioning deficits during her school years, the ALJ accused Plaintiff of reporting "greater limitations than previously seen" over time, citing an October 2013 report as indicative of the first time that "the claimant began to report greater limitations." (Tr. 347). Aside from the fact that the October 2013 report was completed by Plaintiff's mother, the "greater limitations" and inconsistencies are vastly overstated. For

---

[10]In contrast to the ALJ's characterization, the hearing transcripts reflect frequent confusion and a lack of understanding by the Plaintiff, with contradictory back-to-back responses seeming to reflect that fundamental level of confusion, rather than guile. (*See, e.g.*, Tr. 387-389).

example, the ALJ noted that on the 2010 initial paper application, Plaintiff indicated an ability to do "laundry" without assistance while living with her father. (Tr. 169). However, in 2015, Plaintiff's mother clarified that she did not know how independent Plaintiff had been since she was not there and didn't know what kind of washer he had. (Tr. 411). Even the ALJ acknowledged that Plaintiff previously testified that her father instructed her three or four times on how to do the laundry.  (Tr. 410; *see also* Tr. 41, Plaintiff's testimony that her father "would tell me how to put the quarters in" the washer and dryer).  In one of many allegedly "contradictory" responses highlighted by the ALJ that suggest a lack of understanding by Plaintiff and/or mischaracterization by the ALJ, in 2015 Plaintiff testified "yes" to a leading question if she can do laundry by herself using the "<u>same</u> washing machine" that she had used in <u>2012</u>.  (*See* Tr. 398, ALJ's query suggesting that Plaintiff previously testified that she was able to do laundry by herself after being shown "a couple times").  Contrary to the ALJ's question, the transcript reflects that in 2012, Plaintiff was doing laundry at a laundromat only with the assistance of her sister-in-law (with whom she was then living), and never independently. (Tr. 41).  In 2010, prior to living with her sister-in-law, she lived briefly with her father, where she also required assistance to do laundry.  By 2015, after being raped by her sister-in-law's boyfriend, Plaintiff had moved back in with her mother. (Tr. 418).  Her mother testified that Plaintiff is able to do laundry with assistance with the amount of soap and with her mother "press[ing] the buttons for her." (Tr. 410-411).  Clearly, Plaintiff's affirmative response to the ALJ's question that she was still able to do laundry independently with the "same" machine that she had used in 2012 was inaccurate on several levels; it was not the same machine, and she had never testified that she did laundry independently. Plaintiff required her father's assistance to

use a coin-operated washer/dryer in his basement apartment in 2010.[11] In 2012, she required assistance at a different laundromat while living with her sister-in-law, and in 2015, she required supervision by her mother to do laundry at that home. The main inaccuracy was not the intellectually compromised individual's willingness to respond "yes" to the ALJ's query, but the nature of the misleading query.

The ALJ cited the same initial 2010 application (completed by Plaintiff's mother) as support for an inconsistent statement that Plaintiff was able to do dishes independently when living with her father. At the 2015 hearing, Plaintiff's mother testified that once Plaintiff began living with her, she did not have Plaintiff wash dishes in part because Plaintiff did not seem able to discern by herself that the dishes were still dirty. (Tr. 413). Her mother reported that Plaintiff can vacuum independently and was assigned that household task instead. (Tr. 416). The earlier 2010 report that her daughter did dishes while living at her father's house was not inconsistent with the same witness's testimony in 2015 that her daughter performed that task so poorly that she relieved her of that duty.

The ALJ also stated that Plaintiff "inconsistently testified that she could prepare sandwiches and microwave meals." (Tr. 346). The undersigned is hard-pressed to spot any inconsistency. In 2012 Plaintiff testified "I don't cook on the stove because I'm afraid to touch it. So I always use the microwave for everything." (Tr. 34). Plaintiff did respond "yes, Ma'am" without elaboration to the ALJ's inquiry if she made "sandwiches or stuff like that?" (*Id.* at 34-35). Aside from failing to volunteer a reference to "sandwiches" in 2015, Plaintiff's and her mother's testimony, about Plaintiff's inability to cook other than with a

---

[11]Although Plaintiff testified that she learned how to put the quarters in correctly by herself at her father's house in 2010 after he showed her approximately four times, she did not clearly testify that she could complete the entire laundry process independently at any time. (Tr. 41).

microwave, were entirely consistent in 2015. (*See* Tr. 403-405, Plaintiff's testimony about a failed attempt to use the stove with her mother's help and occasional need for assistance with frozen meal instructions; Tr. 411-412, mother's testimony about Plaintiff's inability to use stove, oven, or toaster oven, but explaining she needs only "a little bit of help" with the microwave).

The ALJ also found that Plaintiff reported greater limitations when her mother reported her need for "reminders to shower and brush teeth." (Tr. 347, citing Exh. 16E). Again, the record does not fully conform to the ALJ's interpretation. The October 2013 report highlighted by the ALJ is consistent with high school records, which also reflect "severe" deficits in dental care and personal grooming. Ignoring that evidence, the ALJ focused on Plaintiff's initial December 2010 paper application that "endorsed no difficulties in tending to her own personal grooming and hygiene needs." (Tr. 346). At the time, Plaintiff was residing with her father; again, the form was completed by Plaintiff's <u>mother</u> (and not Plaintiff herself). It is true that under "personal care," Plaintiff's mother "endorsed no difficulties" by checking a box indicating "no problem with personal care" with no "special reminders" needed. (Tr. 168). And it is also true that at the 2012 hearing, Plaintiff responded "yes" to the ALJ's simple question of whether she is "independent in getting dressed every day and getting showered and that kind of stuff?" However, at the 2012 hearing, the ALJ asked no follow-up questions about reminders. (Tr. 42). On the October 2013 form, Plaintiff's mother (again misstated by the ALJ as Plaintiff herself) reported that Plaintiff does require some reminders to shower and brush her teeth. At the 2015 hearing, her mother clarified that Plaintiff is able to shower and brush her teeth independently but does need verbal reminders to do so. Her mother also testified that

she assists her daughter with her bra because she gets it "all twisted up," but readily confirmed that Plaintiff otherwise is independent and has no trouble dressing herself. (Tr. 414-415).  In short, the reports are not nearly as inconsistent as the ALJ makes them out to be.  While the ALJ insists that Plaintiff reported "greater" limitations over time (focusing on what was arguably simply a greater level of detail reported by Plaintiff's *mother,* when she was asked more specific questions), those limitations were <u>consistent</u> with earlier documented "severe problems" found in Plaintiff's adaptive functioning, including dental and other personal hygiene issues, when Plaintiff was 17.

In addition to the ALJ's frequent misstatements and failure to acknowledge school records that documented significant deficits in adaptive functioning at age 17, the ALJ's articulated support for finding that Plaintiff lacks deficits in adaptive functioning as an adult – even when it accurately states the record - is equally troubling.  Plaintiff has never been able to pass a driver's test, and is unable to use public transportation.  (Tr. 169; Tr. 276). She relies solely upon others' assistance to keep track of and drive her to any appointments.  The ability to use public transportation and pass a driver's test are typically viewed as modest, but not conclusive, evidence of adequate adaptive functioning in adulthood.  *See, e.g., Brown v. Secretary of HHS*, 948 F.2d 268 (6th Cir. 1991) (remanding for further evaluation under Listing 12.05C because I.Q. score of 68 was not necessarily inconsistent with functional abilities to use public transit, possess driver's license, work as a truck driver, visit friends, make change at grocery store, and do his own laundry and clean his room).

Considering that the ability to use public transportation and pass a driving test are not sufficient to show adaptive functioning in excess of Listing 12.05C, one would expect

that the lack of such skills might be viewed as some evidence of deficits in adaptive functioning. Here, however, the ALJ focused on Plaintiff's ability to "travel alone by foot," to a nearby park or to a library,[12] as evidence of a lack of deficits. (Tr. 346, citing Tr. 169, mother's report that she goes outside once a week for short distances; Tr. 347). No authority supports the ALJ's belief that someone who otherwise meets Listing 12.05C for intellectual disability, and is unable to obtain a driver's license or travel independently by public transportation or by cab, is removed from that Listing due to her ability to walk to a nearby park. The ALJ also focused on the Plaintiff's ability to perform "chores" but as noted above, those abilities were limited and the ALJ exaggerated and misstated the record in describing the chores that Plaintiff could perform independently.[13] *See Ligon v. Colvin*, 2015 WL 5167873 at *6 (M.D. Tenn. Sept. 3, 2015) (reversing for award of benefits under Listing 12.05C, citing DSM V and holding that individuals with intellectual disabilities are capable of household chores, but need some support with more complex tasks including grocery shopping, transportation, home and child-care organization, nutritious food preparation, and banking and money management).

Rather disturbingly, the ALJ heavily emphasized Plaintiff's ability to engage in "relationships with significant others," including a reference to some "friends" with whom she played basketball or met at the park, spoke with on the phone (or texted when she

---

[12]The testimony suggests that Plaintiff often was accompanied to the library by her nieces and a nephew.
[13]The ALJ described Plaintiff as able to engage in "an array of indoor and outdoor household chores," but did not include any detailed list of such an "array." (Tr. 348). The only "outdoor" chore that was referenced was an Emergency Room record indicating that Plaintiff fell while "helping someone carry in firewood." (Tr. 1137). The ALJ also described Plaintiff as able to assist in the care of the family dogs. (Tr. 347, citing but not quoting Tr. 693, report that mother "helps her take care of the dogs"). At the hearing, Plaintiff testified that she "sometimes" helps with care but cannot empty a litter box for the cats and primarily helps by playing with the dogs. (Tr. 394). Her mother testified similarly. Clearly, what little "care" Plaintiff provides for the family pets was consistent with her significant intellectual deficits.

had a phone), and her alleged ability to be intimate with multiple boyfriends.  The ALJ found it particularly "notabl[e]" that she "lived alone in an apartment with a boyfriend for a short time, remaining home alone throughout the day while he worked."  (Tr. 346).  The ALJ repeatedly emphasized "It must be noted that the claimant had a child in 2010, endorsed relationships with significant others throughout the period under review, and expressly advised of [sexual] intimacy with others during 2011."  (Tr. 348, citing Tr. 297, report of unprotected sex and wanting to be checked for STDs."; *see also* Tr. 351, stating that Plaintiff's adaptive functioning is above Listing level severity based on her "development of romantic involvements over time, *most notably … a brief cohabitating relationship with a significant other during the period under review and the birth of a child in 2010*" (emphasis added); *see also* Tr. 352 ("By her own accounts, the claimant was engaged to be married in March 2009, obtained another boyfriend by 2013, and remained in a "good" relationship as of January 2014")).

Moral judgments have no place in ascertaining adaptive functioning.  Neither legal authority nor common sense supports the notion that the ability to be sexually active with multiple partners or to get pregnant is evidence of a *lack* of impairment in adaptive functioning.[14]  In October 2010, Plaintiff reported that she briefly had lived with a boyfriend who was violent and abusive (described elsewhere as her "fiancé"), prior to becoming homeless for a few weeks, and later moving in with her father.  (Tr. 272 and 275 (reporting that she is troubled by memories of abuse, including when her "ex" held "a butcher knife

---

[14]Plaintiff's mother testified that at least one such encounter involved a rape.  While such extra-judicial evidence is beyond the scope of and not relied upon for this R&R, the undersigned acknowledges the existence of much academic discussion about the rate of sexual assault involving intellectually disabled individuals, and their capacity to fully consent.

to my throat")).  Contrary to the ALJ's statement that Plaintiff briefly lived alone with the boyfriend/fiancé, more reliable records reflect that the pair lived with his mother and at least one other sibling.  (Tr. 320, 322).  Although Plaintiff responded "yeah" when the ALJ asked if it was "just the two of you?," considering the multiple inconsistent and vague affirmative responses from Plaintiff, and countervailing records that reflected that she and the abusive "fiancé" did not live alone, the ALJ's decision to credit Plaintiff's brief response was not reasonable.  Even if Plaintiff and her boyfriend did live alone, the records at most indicate that the period of time in which Plaintiff lived with this boyfriend was extremely brief, and that it was an abusive relationship – hardly an example of successful independent living skills in adulthood.  (Tr. 275).  Other than that brief period, Plaintiff has lived her entire adult life with a parent or other family member; the record overwhelmingly supports a conclusion that she has no capacity to live independently.

The ALJ's reference to the Plaintiff's capacity to bear a child is even more problematic, since the record reflects that Plaintiff was so completely incompetent to care for that child[15] that the infant was taken away and ultimately given up for adoption – <u>another critical fact omitted by the ALJ</u>.  (Tr. 386, 419, 898).  Again, while the ability to care for and raise children *may* be indicative of a lack of deficits in adaptive functioning as an adult, the absence of that ability should have been viewed as consistent with Plaintiff's documented deficits in adaptive functioning, not contorted so that her mere ability to give birth was used against her.  *See generally, Dragon v. Com'r of Soc. Sec.,* 470 Fed. Appx. 454, 463 (6th Cir. 2012) (mothering not inconsistent with mild intellectual

---

[15]Although there is little evidence about the biological father in the record, it appears that the father might have been the abusive "fiancé."

disability where Plaintiff had IEP and parenting assistance); *contrast Wert v. Com'r*, 166 F. Supp.3d 935 (S.D. Ohio 2016) (finding insufficient deficits under 12.05C where plaintiff raised three children, managed her household, enjoyed numerous hobbies, had a driver's license, and past relevant work that was semiskilled).

The ALJ's repeated references to Plaintiff's "friends" is also somewhat suspect. Plaintiff testified that when she lived close enough to a park, she would walk to that park to play basketball by herself or with "friends," and occasionally met "friends" to listen to music. At the 2015 hearing, Plaintiff lived further away "out in the country" and did not visit with any friends or with her "boyfriend."[16] Contrary to the ALJ's supposition, the undersigned does not view the ability to form social bonds as wholly incompatible with intellectual disability or deficits in adaptive functioning. Nevertheless, even the ALJ had to acknowledge "testimony that the claimant sometimes has difficulties in trying to renew contacts with former classmates and may not realize her continued communications through Facebook or other means are not always well received." (Tr. 352; *see also* Tr. 409, indicating that Plaintiff has had difficulty making friends, that friends tease her, and that when Plaintiff had a phone, she would complain that they would not text her back; Tr. 417, testimony that Plaintiff has difficulty making friends because of her disability, and does not socialize with anyone other than family).

The ALJ's reference to other supposed higher-functioning abilities reflects additional error. For example, the ALJ refers to the claimant's "ability to report to the

---

[16]Plaintiff's mother explained that Plaintiff was in a relationship with the referenced "boyfriend" for about six months, during which the two saw each other only twice, but communicated by telephone every other day or so. (Tr. 416; *accord* Tr. 898-899). Plaintiff could not dial phone numbers from memory but had them written down. (*Id.*)

emergency room for treatment when required, and [endorsement of] …her motive as the knowledge that she can receive treatment and medications without insurance" as indicating "a level of sophistication not typically demonstrated by intellectually disabled individuals." (Tr. 351). The record on which the ALJ relies for this conclusion states as follows:

> Pt. presents to the ED with c/o "I ran out of my thyroid medications and now I[']m having RU back pain." Pt. does not have PCP. States "I just always come to the hospitals to get my medications filled." States she does not go to the clinic because "they want a medical card and I don[']t have one."

(Tr. 816). The ALJ's interpretation of this record is not well-supported considering the record as a whole, including that Plaintiff is completely dependent upon others for transportation to the hospital, to appointments, and to schedule medical care.

The ALJ criticized Plaintiff's "poor work history" that reflected she worked part-time, with a job coach, for only four weeks and earned only $469.00 since reaching adulthood. (Tr. 360). Typically, a longer work history might be used to support the lack of deficits in adaptive functioning, although many people who meeting Listing 12.05C are still able to work. *See Mowery v. Heckler,* 771 F.2d 966, 971 (6th Cir. 1985) *(*reliance on work history alone could not discount valid I.Q. of 66); *Derringer v. Colvin*, 2017 WL 480408 (S.D. Ohio Feb. 6, 2017), adopted at 2017 WL 1180950 (reversing and awarding benefits, rejecting argument that lengthy work history of more than 20 years, as well as ability to obtain driver's license, use public transportation, socialize and attend to personal needs were inconsistent with intellectual disability, citing other significant deficits in adaptive functioning); *but contrast Carmack v. Barnhart*, 147 Fed. Appx. 557, 560–61 (6th Cir. 2005) (finding no deficits where extensive work history included working as a court reporter and owning a salon that required plaintiff to keep the books, manage a business,

and take appointments). Here, the ALJ did not discuss unrebutted testimony concerning the reasons that Plaintiff did not succeed in her short-lived unskilled job, despite the efforts of a job coach, and despite the placement being at "a disability place." (Tr. 553-555; Tr. 274). The ALJ also failed to discuss that Plaintiff received SSI until the age of 20, and that as a disabled individual receiving SSI, a "poor work history" was to be expected during that period.

The other skills which the ALJ believed removed Plaintiff from Listing 12.05C on the basis of her adaptive functioning were the Plaintiff's abilities to "go to the library, utilize a computer, and…text and listen to music on a cell phone." (Tr. 346, citing Exhibit 5F/5). The ALJ also found that Plaintiff testified "inconsistently" that "she shopped for clothing in stores and by computer." (Tr. 347, citing Tr. 695, mother's 2013 functional report that her daughter shops for "clothes" "in stores" and "by computer" about once a month which takes "hours"). The functional report completed by Plaintiff's mother does not indicate that Plaintiff shops independently. At the 2015 hearing, the mother explained that her daughter is not capable of shopping independently; in fact, all evidence and testimony reflects that Plaintiff's intellectual impairment prevents her from being able to tell time, make change, or engage in any kind of financial transactions. (*See e.g.*, Tr. 415, 695). The reported "shopping" was window-shopping when her mother was willing to drive her to the mall.[17] (Tr. 413-414). In short, there is no evidence of Plaintiff's ability to shop

---

[17]No follow-up questions were asked about the report that Plaintiff shopped for clothes on a computer. Considering the consistent evidence of her cognitive inability to engage in financial transactions, it is highly unlikely her mother was reporting that Plaintiff purchased clothes in this manner. The box that her mother checked for such "shopping" also did not indicate whether the computer activity was performed with another person or independently. Although the ALJ pointed out modest evidence by consultant who checked a box that Plaintiff remained "likely" able to manage her own funds (Tr. 350, citing Tr. 218 and 228), and cited evidence that Plaintiff was able to check out CDs from the library as a "capacity for at least basic transactions," the record reflects that Plaintiff generally went to the library with her nieces and nephew. And

independently, much less live independently. (Tr. 414). *Compare Riley v. Colvin*, 2014 WL 1686196 (S.D. Ohio Apr 29, 2014) (Black, J., finding proof of Listing 12.05C overwhelming, rejecting ALJ's reliance on plaintiff's ability to make food, take out the trash, and wash dishes while living with family members) *with West v. Com'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007) (affirming lack of deficits where plaintiff held a long-term, full-time position with the City of Wilmore, cared for his daily needs, paid bills, shopped for groceries, and engaged in numerous other daily activities); *see also Carmack*, 147 Fed. Appx. at 561 (no deficits where business owner had demonstrated ability to keep the books and manage her own finances).

The undersigned appreciates that the facts that Plaintiff could use a library computer to get on Facebook, "met" a boyfriend on the same library computer, and could listen to music and text on her phone (during a period when she had a phone), evidences some modest adaptive skills.[18] However, in order to meet or equal Listing 12.05C, a plaintiff does not need to demonstrate deficits in adaptive functioning in *every* area. *See Craig v. Com'r of Soc. Sec.*, 2015 WL 8207480 at *13 (S.D. Ohio Dec. 7, 2015) (noting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") standards require concurrent deficits in only <u>two</u> of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety); *see*

---

the consultant later revised his opinion and found that Plaintiff was mildly mentally retarded. Considering her extremely limited math skills, no substantial evidence supports any reasonable finding that Plaintiff can consistently engage in financial transactions involving money or funds, despite her limited testimony that she was able to walk to a local store at least one time to buy "frozen stuff and ice cream and candy" with her food stamps. (Tr. 555-556). Even the ALJ conceded that "the broader evidence does not reasonably support …a conclusion" that Plaintiff can manage funds or make her own life decisions. (Tr. 351).

[18]Of course, one could as easily argue that for digital natives, the ability to text or to use Facebook is not incompatible with mild intellectual disability.

*also Ligon v. Colvin*, 2015 WL 5167873 at *5 (M.D. Tenn. Sept. 3, 2015) (quoting DSM-V definition of deficits consistent with intellectual disability "when at least <u>one</u> domain of adaptive functioning is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community").

The undersigned notes that the ALJ was particularly critical of Plaintiff's 2015 testimony that she never texted on a cell phone and did not know how to use the Internet, because she testified to the contrary in 2012. However, as with most of the ALJ's summaries of the testimony, the transcript does not precisely match up with the ALJ's account, and suggests significant confusion on Plaintiff's part. In 2012, Plaintiff readily reported her computer activities, ability to text, and listen to music on her phone. In 2015, she and her mother both reported that she no longer had a phone because she could not afford one, (Tr. 387), and that she no longer visited the library where she had once used a computer. In 2015, she first indicated that she did not text but in the very next sentence responded affirmatively that she "still" listens to music on "her" cell phone, despite no longer owning one. (Tr. 387). Both 2012 and 2015 transcripts reflect frequent confusion and vague responses of "I don't know."[19] Frankly, to this reviewer the 2015 transcript

---

[19]Despite mis-attributing several functional reports as independently completed by Plaintiff (rather than by her mother as the record reflects), the ALJ flatly rejected "[a]ny argument that the claimant's low intellect precludes her capacity as a historian" based upon the ALJ's determination that variances in statements provided by her mother were in conflict regarding Plaintiff's ability to use a cell phone, access the Internet, or operate a computer. (Tr. 348). For the reasons previously described, the undersigned strongly disagrees with the extent of inconsistencies attributed to either Plaintiff or her mother. The ALJ's disbelief that Plaintiff's intellectual disability could contribute to her vague and often inconsistent testimony is not well supported. For example, the ALJ pointed out that Plaintiff <u>denied</u> receipt of special education in several application forms (again completed by her mother), which – incredibly - the ALJ found "further detract[ed] from [her] overall credibility," since educational records unequivocally demonstrated that she had received special education from preschool through her high school graduation. (Tr. 359-360; *but see also* Tr. 360, inconsistently stating that the denial of special education "may" be attributable to "oversight in the filing process," but refusing to believe that Plaintiff's "wildly disparate accounts" of what years she occasionally

26

suggests that Plaintiff did not understand that getting on "the Internet" was equivalent to the use of Facebook, since she first stated she was "not really sure" how to get on "the Internet," and denied knowing how to do so, but simultaneously (in the same line of questioning) and consistently testified - in both 2012 and in 2015 - to being able to use Facebook and/or YouTube to listen to music at the library. (Tr. 388, 549). Her mother testified that Plaintiff occasionally borrows her mother's phone to text and tried to borrow her grandmother's laptop to communicate with "friends" who "don't like to deal with her" via Facebook but that Plaintiff no longer is permitted, since she broke the laptop. (Tr. 408).

Finally, the ALJ cited the opinions of several psychological consultants who assessed Plaintiff with "borderline" intellectual functioning rather than the slightly lower classification of "mild mental retardation" that was consistent with her IQ scores. There is no authority for the proposition that a claimant must obtain any such diagnosis in order to satisfy Listing 12.05. *See, e.g., McClellan v. Astrue*, 804 F. Supp.2d 678, 692 (E.D. Tenn. 2011) (noting that SSA has never adopted any precise diagnostic criteria, and has "*explicitly* declined to use the DSM criteria") (emphasis original); *Craig v. Com'r*, 2015 WL 8207480 at *13 (collecting cases, reversing for benefits award, despite psychologist's opinion that plaintiff's "intellectual functioning likely optimally falls in the borderline range"). Moreover, none of the consulting psychologists appear to have had access to

---

used tobacco and/or marijuana could be attributed to any mistake in recall. (*Id.*)   In another example, the ALJ noted that in 2012, Plaintiff reported the year she had last used marijuana was 2005 (seven years earlier) but that in November 2007, Plaintiff reported her last use in September 2007 (two months prior to the inquiry).  In someone with average intelligence, such discrepancies might be understandable, with more accurate responses provided closer in time to the inquiry. Despite the ALJ's focus in this area, there was no evidence of any substance abuse disorder, and the ALJ found none.

Plaintiff's school records, which established her deficits in adaptive functioning during the developmental period. *See Clark v. Com'r of Soc. Sec.*, 2013 WL 4518742 at *6 (S.D. Ohio Aug. 26, 2013) (Black, J.) (reversing for award under Listing 12.05C, rejecting Commissioner's reliance on consulting report where consultant lacked access to education records).

Despite the fact that few, if any, of the consultants had access to Plaintiff's complete school records, and despite the ALJ giving the greatest weight to a few opinions that classified Plaintiff within the "low borderline" range, it is noteworthy that Plaintiff has been formally "diagnosed" with Listing level impairment on multiple occasions. On the whole, the medical opinion evidence substantially supports the conclusion that Plaintiff meets or equals Listing 12.05C.

Two assessments were performed by examining psychologist Dr. George Schultz. In November 2007, Dr. Schultz diagnosed affective disorders and a full-scale IQ of 65. Based upon his clinical interview in 2007, Dr. Schultz concluded that Plaintiff's "overall language usage/recognition and adaptive behavioral functioning did not support a diagnosis of mental retardation." Despite "scor[ing] on the extremely low range on the WAIS-II," he believed her to "function[] within the borderline range" estimating that her valid IQ scores "likely…underestimate her actual level of intellectual/cognitive functioning." (Tr. 219). Dr. Schultz specifically noted that Plaintiff reported being able to "feed, bathe, dress herself and take care of her personal hygiene needs." He noted her daily activities included visits with a friend, listening to music, watching TV, and doing chores, including washing dishes, cleaning and yard work that she did with her sister, and laundry that she reported doing with her mother. (*Id.*)

In 2009, Dr. Schultz reassessed Plaintiff.  Dr. Schultz acknowledged that despite his 2007 diagnosis of borderline functioning, "her current level of adaptive behavioral functioning supports a diagnosis of *mild mental retardation*." (Tr. 225, emphasis added). In modifying his formal diagnosis, Dr. Schultz again cited Plaintiff's "language usage/recognition" and "adaptive behavioral functioning.  (Tr. 229).[20]  Interestingly, the specific behaviors stated by Dr. Schultz were exactly the same as those previously reported. (Tr. 229-230).  Citing that fact and the obvious inconsistency with Dr. Schultz's wholly unsupported statement that Plaintiff could manage her own funds, the ALJ elected to give greater weight to his 2007 diagnosis.  (Tr. 362).

On October 18, 2010, Kaye Krueger, Ph.D., filed a disability assessment report based upon test results and clinical findings made by Dr. Lester.  Under "[o]verall clinical impression," the report assessed Plaintiff as "[w]ithin ..the low borderline range." (Tr. 276). The report acknowledged Plaintiff's full scale IQ was only 43, reflecting moderate (rather than mild) intellectual disability.  Despite finding no invalidity to the IQ score itself, the report stated that the score was a "low estimate of her actual functioning," which the writer estimated to be "likely …at the low end of the borderline range."  (Tr. 277).  The primary basis provided for assessing Plaintiff at the "low end" of borderline functioning rather than as mildly disabled was her self-reported ability to use a computer, text on her phone, and report of "no problems with household chores."  (*Id.*)  However, the report also noted

---

[20]In another misstatement of the record, the ALJ attributed Dr. Schultz's changed assessment as "stemm[ing] in large part from the claimant's new allegations of a history of anger…" (Tr. 350). Dr. Schultz's 2009 report does not comport with that attribution. The ALJ also asserted that Plaintiff's language skills had "inexplicably diminished," and that her adaptive functioning had "somehow regressed," implying deceit. Again, no examiner including Dr. Schultz ever suggested or implied in any manner that Plaintiff's IQ scores were invalid, that she was not credible, or that she did not put forth her best efforts during testing.

Plaintiff required "repeated encouragement" to understand and carry out simple instructions and recalled only 1 of 5 objects after a 5 minute delay. She was described as "passive" and required repetition and redirection during testing, as well as "a great deal of encouragement" at a "somewhat slowed" pace, and was unable to perform a simple backwards counting test. (Tr. 278). Avoiding the modifying phrase that Plaintiff was "at the low end," the ALJ stressed the report's assessment of Plaintiff's actual functioning as above Listing level. (Tr. 366).

On October 19, 2012, Plaintiff was evaluated by a master's level psychologist, Ronald Lott, M.A. Mr. Lott administered IQ tests, finding a full scale IQ of 63, and again assessed Plaintiff as within the "Extremely Low range," equivalent to a diagnosis of intellectual disability under Listing 12.05C, when compared to her peers in all areas - with the lone exception of a subtest for "processing speed" of "simple visual information." (Tr. 880). The ALJ misstated the latter finding as a conclusion that "her functioning rested at *borderline* – as opposed to *intellectually disabled* – levels." (Tr. 351, emphasis original). Overall, Mr. Lott assessed her general ability and performance within the "Extremely Low" range, consistent with Listing 12.05C and reflecting her eligibility for Medicaid.[21] (Tr. 880-881). He also completed a Mental RFC report, wholly rejected by the ALJ, which indicated Plaintiff was "markedly impaired" in all but a few functional areas. (Tr. 877-878).

In January 2013, Plaintiff began treatment with a psychiatrist, Ramesh Shivani, M.D., for depression and psychosis, including auditory hallucinations. It is apparent from the records that Dr. Shivani's focus was on treating Plaintiff's mental illness; he performed

---

[21]In another area of the opinion, the ALJ accurately stated that Mr. Lott assessed "mild intellectual disability," but discounted his opinion because Medicaid standards differ from those required to prove eligibility for Social Security benefits. (Tr. 365).

no IQ testing. Nevertheless, Dr. Shivani diagnosed borderline intellectual functioning based upon Plaintiff's clinical presentation. (Tr. 895). Dr. Shivani also completed a mental RFC assessment (also rejected by the ALJ) in which he opined that Plaintiff would experience "moderately severe" to "severe" difficulties in the vast majority of work-related functional areas due to her "chronic relapsing [mental] illness." (Tr. 1349-1351).

Plaintiff's next consultative evaluation was dated January 11, 2014, and conducted by Norman Berg, Ph.D. Dr. Berg noted Plaintiff's self-report that she is able to wash, dress, and attend to her personal hygiene needs, heats food in the microwave, does some cleaning, helps with laundry, watches movies and listens to music. She also reported getting on Facebook. (Tr. 900). Importantly, Dr. Berg performed <u>no IQ</u> testing. Based solely on her clinical exam, he assessed Plaintiff as functioning "<u>no higher than the lower part of the borderline range of intelligence</u>, and her intellectual functioning <u>might be even somewhat lower</u> than this." (Tr. 901, emphasis added). The ALJ gave the most weight to Dr. Berg's assessment, citing his "battery of sensorium and cognitive testing" but omitting the fact that he performed no IQ testing, and without discussing his ambiguous statement that he assessed her at "no higher than" the lowest part of "borderline" range and possibly "even...lower," or at Listing level. (Tr. 363).

A few months later, on March 18, 2014, Plaintiff underwent another assessment by Olayinita Aina, M.D., MPH. Dr. Aina noted that Plaintiff requires reminders for medications and to help with her hygiene, is unable to dress herself or make meals for herself, and unable to ride in public transportation. Although Dr. Aina focused on Plaintiff's physical examination, based upon her clinical interview she also diagnosed Plaintiff with mental retardation. (Tr. 905-906). The ALJ rejected that diagnosis because

"Dr. Aina was employed to …evaluate the claimant's physical functioning alone, and conducted no objective mental testing." (Tr. 364). The ALJ also found that the clinical diagnosis was based upon "subjective" reports by Plaintiff and her mother that the ALJ found to be "unsubstantiated" based upon the ALJ's adverse credibility determination. (Tr. 365). For the reasons previously stated, the undersigned finds Dr. Aina's clinical assessment to be consistent with the record, including long-standing documented deficits in adaptive functioning and consistently qualifying IQ scores.

Non-examining agency reviewing consultants generally concluded that Plaintiff functioned at the "borderline" level. However, regulatory presumptions typically give less weight to the opinions of non-examining reviewers than to the opinions of examining consultants. In keeping with that presumption, the ALJ did not give any of their opinions significant weight, disagreeing with some of their assessments, while finding others "consistent" with her conclusion. (Tr. 363).

Looking at the record as a whole, the undersigned finds overwhelming evidence that the Plaintiff meets or equals Listing 12.05C based upon her well-documented qualifying IQ scores, deficits in multiple areas of adaptive functioning prior to age 22 and continuing into adulthood, and other severe mental and physical impairments. As a whole, the record demonstrates adaptive deficits in home life (limited ability to perform chores independently, extremely limited food preparation skills with inability to use oven, stove, or toaster oven), community resources (inability to drive or to use public transportation), communication (psychological reports and educational records), self-care (reminders for brushing teeth and showering, assistance with bra), social/interpersonal skills (few friends, reported difficulties in understanding social cues), self-direction,

functional academic skills, work (failed attempt with job coach), and health and safety (school records, prior abusive relationship).

In seeking to uphold the non-disability determination, Defendant cites *Foster* and one other case in which the Commissioner's decision has been affirmed despite qualifying IQ scores, based upon a demonstrated higher level of adaptive functioning. However, both cases are clearly distinguishable. In *Foster*, the claimant's long history of working in accounting and as a store clerk, together with other substantial evidence, reflected no significant deficits in adaptive functioning. *See also Hayes v. Com'r*, 357 Fed. Appx. 672 (6th Cir. 2009) (finding substantial evidence of "borderline" adaptive functioning where the plaintiff "cares for herself and her husband, cooks meals, does laundry, and shops; manages her finances and takes public transportation").

### III. Conclusion and Recommendation

Viewing the record as a whole, the undersigned finds overwhelming evidence that Plaintiff meets or equals Listing 12.05C. Benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Vorhis-Deaton v. Com'r*, 34 F. Supp.3d 809, 822 (S.D. Ohio 2014) (Black, J., remanding for immediate award under Listing 12.05C, citing *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)). Here, not only is proof of disability overwhelming, but opposing evidence is lacking in substance; therefore, remand without an award of benefits would serve no purpose other than delay. *Id.*; *see also Dragon v. Com'r of Soc. Sec.*, 470 Fed. Appx. 454 (reversing for award of benefits under Listing 12.05 where ALJ improperly ignored and invalidated qualifying IQ scores despite "significant" evidence of deficits in adaptive functioning); *Roark v. Com'r*

*of Soc. Sec.*, 2011 WL 795896 at *4 (S.D. Ohio Mar 1, 2011) (Black, J.) (reversing for award of benefits despite consultant's opinion that plaintiff, who had a work history in low-skill jobs and was married, appeared to have functioned in borderline to low average range of intellectual abilities).

Accordingly, **IT IS RECOMMENDED THAT** the decision of the Commissioner to deny Plaintiff SSI benefits be **REVERSED** because it is not supported by substantial evidence. **IT IS FURTHER RECOMMENDED THAT** this matter be **REMANDED for an immediate award of benefits** beginning on July 1, 2007, immediately following the termination of her prior SSI benefits.

*/s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LONELLE C. PENNINGTON,                              Case No. 1:17-cv-264

       Plaintiff,                              Black, J.
                                                      Bowman, M.J.
   v.


COMMISSIONER OF SOCIAL SECURITY,

       Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).